FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2020 MAR -3 P 2: 46

CLERK'S OFFICE
AT GREENBELT

BY ___ ✓

UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SOLON PHILLIPS, | * | |
| Plaintiff, | * | |
| v. | * | **COMPLAINT** |
| MARYLAND BOARD OF | * | |
| LAW EXAMINERS | * | Civil Action No. |
| AND | * | GLR 20 CV 0583 |
| JONATHAN AZRAEL | * | JURY TRIAL DEMANDED |
| AND | * | |
| JOHN MUDD | * | |
| AND | * | |
| DAVID RALPH | * | |
| AND | * | |
| MATTHEW MILLS | * | |
| Defendants | | |

---

**COMPLAINT**

Solon Phillips, *pro se*, is suing Defendants, not because he wants to, but because

he has to.  Defendants have intentionally committed several heinous acts.  These acts

have all but destroyed the Plaintiff.  If Plaintiff relents and allows these atrocities to go

unnoticed, Defendants stand to repeats these acts—against him and against someone

else.  No one should endure what Plaintiff has endured.  These injustices impact everyone.  An injustice anywhere is an injustice everywhere.  With that, Plaintiff files this suit and states:

**The Plaintiff**

1.   Solon Phillips is a 46-year old African American man.

2.   Solon Phillips has never been arrested.

3.   Solon Phillips has never cursed.

4.   Solon Phillips has never used illicit drugs.

5.   Solon Phillips has never imbibed alcohol.

6.   Solon Phillips has never stolen money.

7.   Solon Phillips is a Biblical scholar.

8.   There are no witnesses to have ever testified that Solon Phillips has poor, questionable, or immoral character.

9.   Solon Phillips has a 25-year history of giving money to the homeless and needy.

10.   Solon Phillips has a 25-year history of being a Bible teacher, a mentor, a community volunteer, a deacon, a men's leader, and a religious liberty leader

11.   Solon Phillips is a community award recipient, a published author, and a single father of two children who are now law-abiding adults.

12.   Solon Phillips has donated tens of thousands of dollars to needy members within his community.

13.   Solon Phillips has financed two children through private school and college.

14.   In 20 years, there is no finding of Solon Phillips filing for bankruptcy.

15.   Solon Phillips is an author who has won an award for his book Colored Water: Marriage, Involuntary Divorce, the Law, and God.

16.     Churches use Solon Phillips' writings across the country as a tool to teach high moral standards.

17.     Solon Phillips has a Facebook page where he publicly writes about love, God, and doing the right thing in bad situations.

18.     Solon Phillips underwent a forensic psychological exam and the results shows Solon Phillips to be a man inclined to high moral standards.

19.     Twice, members from the Maryland Character Committee have interviewed Solon Phillips and twice they reported that he possesses the requisite moral character for admission into the state bar.

20.     The District of Columbia character committee interviewed Solon Phillips and found him to possess the requisite moral character necessary for admission into the D.C. bar.

21.     The Alabama character committee interviewed Solon Phillips and found him to possess the requisite moral character necessary for admission into the Alabama bar.

22.     A Maryland judge reviewed Solon Phillips and found him to possess the requisite moral character necessary to practice in his Maryland court.

23.     Solon Phillips is a man of high moral character.

**The Defendants**

24.     The State Board of Law Examiners administers the bar examinations, oversees the character and fitness process, and provides recommendations on the admission of each applicant to the Court of Appeals.

25.     Defendant Jonathan A. Azrael is the Chair of the Board for the State Board of Law Examiners and was present at the Plaintiff's character hearing.

26.     John F. Mudd is a member of the Board for the State Board of Law Examiners
        and was present at the Plaintiff's character hearing.

27.     David E. Ralph is a member of the Board for the State Board of Law Examiners
        and was present at the Plaintiff's character hearing.

28.     Matthew T. Mills is a member of the Board for the State Board of Law Examiners
        and was present at the Plaintiff's character hearing.

29.     All four of the named individuals who were present at Plaintiff's July 2017
        hearing, have no clear definition of "good moral character."

30.     Each of the four Defendants, in answering this Complaint, will admit to the above
        facts regarding Solon Phillips.

31.     If the Defendants deny any of these aforementioned facts, it will prove that they
        are not trustworthy because these are documented facts.

32.     If Defendants claim that there is insufficient evidence to support or deny these
        aforementioned facts, then they prove themselves to be negligent, because these
        are the very facts Defendants were tasked to discover before publishing their
        defamatory statements to the Court of Appeals.

### JURISDICTION

33.     Jurisdiction is proper because (1) the complaint alleges an actual controversy
        between the parties of sufficient immediacy and reality to warrant issuance of a
        declaratory judgment, (2) the court possesses an independent basis for
        jurisdiction over the parties, and (3) Plaintiff's Complaint implicates significant
        federal issues.  28 U.S.C. § 1331; *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip.
        Co.*, 386 F.3d 581, 592 (4th Cir. 2004).

## UNDISPUTED BACKGROUND FACTS

**In 1974: Solon Phillips Early Life**

34.   Plaintiff Solon Phillips has always demonstrated a proclivity to act on his moral

      beliefs, which are rooted in his Christian faith.

35.   At age 20, he chose to withdraw from his pre-medicine studies at Oakwood

      College and marry his pregnant girlfriend because he believed that to be the

      morally right thing to do.

36.   At age 21, he became Prince George's County youngest foster parent and was

      commended and recognized for his outstanding service to children in foster care

      because he believed he could help young people in need.

37.   At age 22, he was awarded an Outstanding Young Men of America for achieving

      a 3.81 GPA as a pre-medicine student while volunteering his time in a

      community center in Takoma Park, Maryland, which he says is a testament to his

      faith.

38.   At 23, he became a member of Men of Impact, a church group of men who were

      committed to mentoring young people in Prince George's County.

39.   At age 29, Plaintiff became a single father.  His then wife informed him that she

      felt she had married too young, that she had children too young, and that it

      would be better for the family for her to leave.

40.   At age 30, Plaintiff was accepted into American University Washington College

      of Law and began his first year in law school in August of that same year as an

      evening, part-time student while being a full-time father.

41.   From an early age, Plaintiff has actively displayed a fiduciary duty to society,

      living by the creed of service to God and man.  From the time he was 20 years

old until present he has served as a preschool Bible teacher, a Bible teacher for

teens, a Bible teacher to adults, a Men's Ministry leader, a community basketball

coach, a religious liberty leader, a deacon, legal ethics instructor, a homeless

ministry member, a prison ministry member, a Pathfinder leader, an author of

Christian publications, and a recipient of the Men of Honor award for

outstanding work in the Washington, D.C. Metro area.

## 2004: Beginning of Plaintiff's Divorce Proceedings

42.     In 2004, approximately 7 months after his wife moved out of the marital home,

Plaintiff asked his then wife for financial assistance in raising the two children,

Adonis and Athena.

43.     His ex-wife declined to offer financial assistance and insisted that the children

move in with her.

44.     Plaintiff declined this offer on the basis that the children had not seen their

mother in nearly a year and to just change their routine now simply because he

asked for child support was not in the best interest of the children.  Even still,

Plaintiff waited on his wife to move back home and be a family.

45.     Upon discovering that his ex-wife had a live-in boyfriend, he asked her if she

would ever be coming home.  She said, "No" and advised him to file for divorce.

He then filed for divorce on grounds of adultery.

46.     Plaintiff vowed to continue to be the best father he can be to his two children,

raising them to adhere to the same Christian beliefs.

## In 2008, Plaintiff's Motion to Recuse Judge Toni Clark

47.     In 2004, Judge Toni Clark was the judge assigned to Plaintiff's divorce case.

48.   At the onset, Judge Clark was noticeably biased against Plaintiff. For example, in 2005, she denied his complaint for divorce on the ground of adultery for "condonation" holding that because he openly stated in court that he still loved his wife this meant he forgave her for her past and present and ongoing adultery.

49.   Another example of the unfair treatment towards Plaintiff was Judge Clark, though awarding him primary residential custody, awarded him only $33/month in child support holding that he will be an attorney one day and could therefore financially rehabilitate himself.

50.   An attorney, Paul Eason, would later file for a modification for child support and was able to secure the correct amount for Plaintiff.

51.   The unfair treatment continued over the years and finally escalated to Judge Clark issuing an order for the two parties to return to court in three months, February 2009, and, if upon Plaintiff's ex-wife word that Plaintiff violated the order by not delivering the children to her on time, she would order him to weekend incarcerations.

52.   Because of this, Plaintiff filed a Motion to Recuse Judge Toni Clark. In this motion, he detailed how Judge Clark had unfairly treated him over the years and stated that he would undoubtedly be incarcerated if his freedom was left to his ex-wife's word.

53.   He hand-delivered this Motion to Recuse to the Chief Judge of Prince George's County Circuit Court.

54.   A few months later, in November 2008, Judge Clark recanted her own order and closed the case.

55.     Little did Plaintiff know that Judge Clark, within a week of recanting her own

order, sent the Board of Law Examiners a letter, lambasting Plaintiff for being

disrespectful to the Bench.  In this letter, she made accusations that were not

only no true and baseless, but more shockingly, she advised the Board of Law

Examiners to deny Plaintiff admission into the Maryland Bar.

**February 2011 Plaintiff Passes the Maryland Bar and Receives Favorable Recommendation for Admission Into Bar, But Admission is Halted**

56.     Plaintiff graduated from American University Washington College of Law in

May 2008.

57.     Plaintiff enrolled in MBA School, purchased a house, and then passed the

Maryland Bar in February 2011 after graduating from his MBA program.

58.     Before passing the Maryland Bar in 2011, Plaintiff was interviewed by the

Character Committee in 2007, and received a favorable recommendation to the

Maryland Bar.

59.     When the time came for Plaintiff to be sworn into the Maryland Bar in June

2011, Plaintiff did not receive any of the invitation tickets for the ceremony.

60.     Upon inquiry, Plaintiff was told that his application had been "lost" and that

he had to fill out a new application in order to make the June 2011 swearing-in

ceremony.

61.     Plaintiff quickly filled out the online application and waited for the invitations.

62.     After several months of inquiring about his swearing-in ceremony, Plaintiff

was finally told that Judge Clark's 2008 letter had surfaced and that there now

must be a hearing on his character.

63.     Plaintiff hired Mark Foley to represent him at the hearing.

64. Mark Foley requested Paul Eason, who was now a magistrate judge at the same court, to be a witness.

65. At this hearing, Master Eason testified that Judge Clark was in fact, "not unbiased" towards Plaintiff.

66. He testified under oath, that Judge Clark accosted him in the parking lot and informed him that she would be writing a caustic letter about Plaintiff to them.

67. At the end of the hearing, it was concluded that once Plaintiff updates his application with a copy of his credit report, a decision would be made.

68. Plaintiff updated his application within 30-days, but a decision was not made until nearly four years later.

**From 2011 to 2014 Plaintiff Demonstrates Candor By Voluntarily Supplementing Record With Over 10 Disclosures Over Four Years**

69. During this near four-year period, Plaintiff worked as a law clerk with Arnold & Porter. Some of his mentors suggested that Plaintiff demand a decision from the Board as his life was literally being unduly and unnecessarily placed on hold.

70. During this time period, Plaintiff provided over 10 supplements to the record, updating his application with disclosures of any and all pertinent happenings in his life, thus creating a pattern of candid disclosure.

71. On the advice of senior attorneys at Arnold & Porter, Plaintiff instructed his attorney, Mr. Foley, to demand a decision by the end of the week.

72. The Character committee issued their unfavorable recommendation at the end of the week and gave reasons that were inapplicable to Plaintiff.

73. Plaintiff hired Norman Smith to represent him to the Board of Law Examiners.

74. The procedure in Maryland is if the Character Committee gives an unfavorable recommendation, the applicant is then given the opportunity to be heard by the Board of Law Examiners.

75. Mr. Smith felt Plaintiff had a strong case and prepared to disprove everything in the letter provided by Judge Clark and to show that applicant was in fact a moral individual worthy of admission into the Maryland Bar.

**In 2015, Plaintiff's Questionable Attempt to Help Facebook Group Member**

76. While in law school, in 2007 to be exact, Plaintiff incorporated an LLC that would one day be a law firm. The law firm would include himself, his father, and a high school friend who was also in law school. He named the firm, Phillips, Phillips, and Dow.

77. While still in law school and realizing that this dream firm was too far off in the future, he allowed the LLC to lapse and did not do anything further with the firm. Indeed, he could not. He was not licensed, his father was not yet retired, and his high school friend was living in Georgia with no plans of moving to Maryland. The most Plaintiff did in preparing this firm prematurely was incorporate and purchase letter head in 2007.

78. In 2013, six years later, Plaintiff was part of a private online support group. The group consisted of approximately 3000-5000 members from all around the world and was geared towards supporting spouses experiencing difficulty in their marriages.

79. One lady, Crystal Meeghan asked the group for help in dealing with her ex-husband's new wife, Abigail Meeghan, who was harassing her.

80.  Plaintiff offered help.  Even though he had never met Crystal personally, have never spoken to her on the phone, had never even texted her, he emailed her a cease-and-desist letter that could be mailed to the accused harasser to motivate her to stop harassing Crystal.

81.  To cause the letter to have more of an effect, Plaintiff unearthed the 2007 letter head, pasted the online letter on the letter head, signed his father's name, and mailed it to the Abigail.

82.  Plaintiff never made any agreements with Crystal Meeghan.

83.  Plaintiff did not receive any money from Crystal Meeghan.

84.  Plaintiff did not provide any legal services to Crystal Meeghan.  The only understanding was that Plaintiff was helping a fellow group member stop harassing texts, calls, and emails.

85.  When Abigail received the letter, she filed a complaint with the Maryland Grievance Committee and reached out to Plaintiff's father since his name was on the letter.

86.  Unbeknownst to Plaintiff, Plaintiff's father and Bar Counsel began an unnecessary feud.

87.  This feud resulted in Plaintiff being subpoenaed to be a witness for the Grievance Committee in his father's disbarment hearing.

88.  Part of the accusation against Plaintiff's father was that Plaintiff's father instructed Plaintiff to write and mail the letter.  This was viewed as a violation of the Maryland Professional Responsibility Rule against the unauthorized practice of law.

89.     At no point in time was Plaintiff charged with the crime of unauthorized practice
        of law.

90.     In January 2015, when Plaintiff received word that he was involved in this
        dispute between his father and Bar Counsel, he informed his attorney who in
        turn, informed the Board.  The lapse in time of discovery and disclosure was less
        than a week.

**In 2015, Plaintiff Withdraws Maryland Bar Application**

91.     When Mr. Smith received the news from Solon that he was part of a case against
        his father, Mr. Smith advised Plaintiff that it would be in his best interest to
        withdraw his application until after his father's pending case.

92.     Mr. Smith, Plaintiff's attorney, informed him that he informed the Bar of the case
        and his involvement.

93.     In 2015, after waiting four years to be barred in Maryland, Plaintiff withdrew his
        application to the Maryland Bar.

**From 2015 to 2016, Plaintiff Rehabilitates Himself**

94.     During the time after Plaintiff withdrew his application, he began studying the
        laws of professional responsibility.

95.     He reached out to his mentor, Paul Sandler, and asked questions and received
        copies of his books.

96.     He took a professional responsibility course and then enrolled to take the MPRE,
        the exam that governs attorney ethics, and passed that exam--twice.

97.     After spending a year engaged in learning the laws governing attorney
        responsibility, he decided to resubmit his application to become a member of the
        Maryland Bar.

**In February 2017, Plaintiff Retakes Maryland Bar and Reapplies for Admission**

98.     In February 2017, Plaintiff sits for the Maryland Bar again and passes it.

99.     Plaintiff discovered he passed the exam in May 2017, and, feeling good about

        himself, decided to take another bar exam—the Florida Bar exam.

100.    During the second week of May 2017, Plaintiff mailed off his initial Florida Bar

        application.

101.    Later in May 2017, Plaintiff had his interview with a member of the Character

        Committee, Ms. Deborah Johnson.

**In May 2017, Plaintiff Interviews with Deborah Johnston of the Character Committee**

102.    In May of 2017, Plaintiff met with Ms. Deborah Johnson.

103.    He interviewed with Ms. Johnston for over an hour.

104.    During this hour-long interview Plaintiff disclosed that he had applied to the

        Florida Bar.

105.    During this same interview, Plaintiff disclosed, at length, of the facts

        surrounding his involvement with his father's disbarment.

106.    At the end of the interview, Ms. Johnston commended Plaintiff on his candor and

        all he had done in his community and church, but especially for raising his two

        children in the manner in which he had raised them.

**In June 2017, The Board Requests A Hearing And Violates Maryland Rule**

107.    In June 2017, a few weeks after Plaintiff interviewed with Ms. Johnston, he

        received notification from the Board of Law Examiners the there would be a

        hearing held in July 2017.

108.    The Board did not provide Applicant with a copy of Ms. Johnson's character

        report prior to this hearing despite the Maryland rule mandating this disclosure.

109.   In this June 2017 Notice of Hearing, the Board stated it wanted to discuss three matters with Plaintiff: (1) The facts surrounding his engaging in the unauthorized practice of law, (2) The facts surrounding his failure to disclose that he committed the unauthorized practice of law and contributed to the disbarment of Dalton Phillips, and (3) Whether there is a cumulative pattern reflected in the matters identified above which suggests a pattern of a lack of candor and failure to abide by the law."

110.   The Board, in the June 2017 notification to Solon Phillips, did not state that it wanted to discuss whether Solon Phillips had disclosed his involvement with this father's disbarment to Deborah Johnston.

111.   In Plaintiff's application, he included a written explanation of his involvement with this father's disbarment that the Board admittedly did not see.

112.   Plaintiff retained Paul Sandler to represent him at the hearing.

**In July 2017, The Board Withholds Information and Relays False Information to Court of Appeals**

113.   As the third ranked attorney in Maryland, Mr. Sandler thoroughly prepared for the June 2017 Hearing before the Board.

114.   He prepared to show that Plaintiff did in fact disclose his father's involvement in his bar application.

115.   He prepared to explain Plaintiff's involvement in his father's disbarment and his rehabilitation activities following his involvement.

116.   He prepared to explain to the Board, Plaintiff's history of good character and presented character letters from attorneys, elders, pastors, and laypersons.

117.   What he did not prepare for was what the Board would later give as the reason for recommending that Plaintiff be denied admission into the Maryland Bar.

118.   In October 2017, the Board's final recommendation was to deny Plaintiff admission into the Maryland Bar because, "upon reviewing the Committee's report and recommendation, *it appears* that the events related to the applicant's unauthorized practice of law and his prominent role in his father's disbarment may not have been sufficiently explored." (emphasis added).

119.   The Board, at no time, asked Plaintiff, Plaintiff's attorney, or Ms. Johnson if he discussed his involvement with his father's disbarment with the Character Committee member, Ms. Johnson.

120.   Yet, ironically, the Board's final recommendation was to deny Plaintiff admission because it appeared that he had not.  Had Mr. Sandler received the Character Committee's report, per the rules, he would have surely contacted Ms. Johnson to address this concern, but then again, he could not have because the Board did not raise this concern in their Notice for a Hearing.

**In November 2017, Deborah Johnson Passes Away**

121.   Because Plaintiff had received a favorable recommendation from the Character Committee and an unfavorable recommendation from the Defendants, by Maryland Rule, the Court of Appeals issued a hearing notice to Plaintiff.

122.   The single issue for the hearing was: Why should the Court accept the Character Committee's favorable recommendation over the Board's unfavorable recommendation.

123.   To Plaintiff, this was simple.  The Board erroneously believed that Plaintiff did not disclose all matters with the Character Committee.  Had the Board received

this information, they too would have had the same recommendation as the
Character Committee because no other issues were addressed at the Hearing.

124.    Plaintiff spoke with Ms. Johnson by email and by phone about the Board's
recommendation.  She was shocked to learn that the Board had offered such a
recommendation and for the reason stated.

125.    Plaintiff emailed Ms. Johnson asking for her to provide a letter stating that he
disclosed all matters in question with her.  Unfortunately, Ms. Johnson passed
away the very same day Plaintiff emailed the letter, within the very same hour.

**Plaintiff Not Afforded An Opportunity to Address Accusations Presented to Court
Post-Hearing**

126.    Plaintiff was given 15 minutes to address the issue of why the Court should
accept the Character Committee's recommendation over the Board's
recommendation.

127.    There were no other issues presented or required for Plaintiff to address.

128.    Plaintiff simply answered the question before the Court by stating that the Board
erroneously believed he had not disclosed this information to the Character
Committee member when, in fact, he had.

129.    After this hearing, Plaintiff had an interview for a position in which the employer
requested the employee to have a juris doctorate degree.

130.    Plaintiff applied using his Indeed resume.

131.    A day before the interview, the employer requested another copy of Plaintiff's
resume.

132.    In the interview, the interviewer asked Plaintiff if he is licensed to practice law.
Plaintiff answered in the negative, but said that his license status is pending in

16

Maryland.  Employer stated that this position requires a law license, not just a

degree.  Plaintiff apologized for the misunderstanding and the interview ended.

133.    Employer mailed the Maryland Board of Law Examiners a statement explaining

what happened.  The Board forwards the letter to the Court as further evidence

of immoral behavior for justifying their unfavorable recommendation.

134.    Plaintiff was not given an opportunity to defend the claims or explain this

situation or the fact that he did in fact make the disclosures to the Character

Committee.

135.    As a result, there is a published opinion with factually incorrect information

bearing negatively on Plaintiff's character.

**In January 2018: After the Denial**

136.    The Court issued a scathing opinion based on the information received from the

Board of Law Examiners that was factually incorrect.

137.    Since the order has been published, Plaintiff has not been able to be hired for

positions for which he is highly qualified.

138.    Per Maryland statute, the Plaintiff-Applicant meets all of the requirements for

admission into the Maryland Bar and therefore the Court of Appeals must pass

an order of admission of the applicant to the Bar.  Md. Code. Ann., Bus. Occ. &

Prof. §§ 10-210-11.

**In February 2018:  Solon Phillips Takes Bar for Third Time and Passes**

139.    In February 2018, Solon sits for the Uniform Bar Exam in the District of Columbia

and passes with a score over 266.

140.    Solon applies to the District of Columbia, Alabama, Montana, New York, and

Washington bar jurisdiction.

141.   The District of Columbia thoroughly investigated Solon's application with Maryland and all that went with it.

142.   The District of Columbia thoroughly interviewed Solon Phillips to determine his character.

143.   The District of Columbia admitted Solon Phillips to the D.C. Bar.

144.   The Alabama Bar committee thoroughly reviewed and investigated Solon's application to Maryland and all that went with it.

145.   The Alabama Bar committee thoroughly interviewed Solon Phillips to determine his character.

146.   The Alabama Bar admitted Solon Phillips to the Alabama Bar.

147.   The other jurisdictions are still pending.

**In 2019, The Forensic Psychological Exam**

148.   In 2019, Solon Phillips underwent a forensic examination to determine whether he has a proclivity to be dishonest.

149.   The test conclusively revealed that Solon Phillips does not possess the character inclined to dishonesty or lack of candor.

**FIRST CLAIM FOR RELIEF:**
**Unconstitutionally Vague Rule For Determining Good Moral Character**

150.   Plaintiff incorporates and alleges the averments contained in paragraphs 1-149 by reference.

151.   "An unconstitutionally vague law invites arbitrary enforcement in this sense if it leaves triers of fact free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Beckles v. United States*, 137 S. Ct. 887, 894 (2017).

152. In Maryland, there is no "litmus test" for moral character or fitness for the practice of law, but Maryland has enunciated four factors that *predominately* suggest moral fitness: (1) financial responsibility, (2) candid truthfulness, (3) lack of criminal activity, and (4) the strictest observance of fiduciary responsibility. *Allan S.*, 282 Md. 683, 691, 387 A.2d 271, 275 (1978).

153. Based on Maryland law, an individual who proves that he is financially responsible, candid and truthful, has not engaged in criminal activity, and has observed the strictest of fiduciary responsibility should be admitted into the Maryland Bar.

154. But this is not the case.

155. **Financially Responsible**. Plaintiff/applicant has financed two children through sixteen years of private education and college, he has purchased a home for these children, he has purchased cars for himself and members of his church, and he has consistently maintained a "good" credit reporting for over 22 years. He has thoroughly proven this first factor and this is not disputed.

156. **Candid and Truthful**. This applicant, through the span of eight years, has supplemented his application to disclose to the Board *all of his activities giving rise to disclosure*. The character committee member who interviewed him reported to the Board that things were disclosed "at length." The applicant has thoroughly proven this fact and this is undisputed.

157. **No Criminal Activity**. The applicant is 46 years old. In 46 years, the record is absolutely void of any criminal convictions. The applicant has thoroughly met this factor and this is undisputed.

158.    **Strict Fiduciary Responsibility**.  And as a father, a son, a brother, a coach, a

mentor, a community worker, a church member, his engagement with the

members of his church and community convincingly proves that he has observed

the strictest of fiduciary responsibility.  Plaintiff has actively proven a

commitment to the well-being of others and has received awards for his

fiduciary responsibilities.  This fact is undisputed.

159.    Despite the fact that Plaintiff met all the factors he was still denied admission

into the Maryland Bar.  This shows that the character committee process is so

vague and arbitrary and so chaotic that good, moral candidates can be denied

admission while bad, immoral candidates can be granted admission.

160.    A simple social media search into some of the Maryland attorneys who this

Board has found to be of "good moral character" reveals that the moral fitness

standard is vague and arbitrary and chaotic.

161.    This Board has issued favorable recommendations for applicants who were

bigots, cheating spouses, foul-mouthed men and women, drunkards, liars, and

who blatantly care more about their pockets than they do about the members of

their own community.  *See, e.g., In re Otion Gjini*, No. 32 (May 10, 2016).  These

are attributes that society deems as immoral.

162.    Meanwhile, the board has issued an unfavorable recommendation for Plaintiff

who has no record of bigotry, no record of cheating, drug or alcohol use, no

record of excessive greed and selfishness, and has a long-standing record

spanning over 20 years of displaying morally what society defines as good,

sound moral behavior.

163. The vagueness of the good moral character standard in Maryland's fitness test leaves an applicant clueless as to what is prohibited and what is not.

164. As the process stands, Board members with no clear understanding of morality can subjectively apply the fitness test to intentionally deny applicant's admission based on any arbitrary definition of candor.  Because Board members are not vetted and are not accountable for their actions, the Board has free reign to discriminate, either intentionally or unintentionally, good, moral applicants who desire admission into the Maryland Bar.

165. Currently, the Board is under the fallacy that candor equals good moral character and lack of candor automatically means immoral or poor character.  An applicant can inadvertently, mistakenly, unintentionally, or ignorantly leave off the fact that he worked for McDonald's for a month during summer vacation and be denied admission, while at the same time, an applicant who is a racist, a self-centered bigot, and a thief who is yet to be caught can disclose all his employment and be admitted to practice law.

166. This is irrational reasoning resulting in arbitrary and chaotic admissions.  By having this arbitrary and chaotic system in place, there is a double negative impact on society.  First, *morally* sound applicants are being denied admission based on the erroneous idea that they are immoral, thus damaging the applicant and depriving society of good, moral lawyers.  Second, *immorally* sound applicants are being admitted based on the same erroneous idea that they are moral, thus exposing society to immoral lawyers, hence the continued negative stigmatism associated with lawyers.

167.   Since attorneys have a longstanding reputation in the community for being immoral, it only makes sense that a Board responsible for deciphering good moral character consists of members of society who are familiar with good moral character: clergymen, sociologists, judges, and for there to be a more objective, clearly defined character test.  As of today, the test in Maryland is unconstitutionally vague and arbitrary.

168.   For these reasons, Plaintiff's denial based on the vague and arbitrary process as applied to his application was and is severely damaged in the amount of $5,000,000.00.

**SECOND CLAIM FOR RELIEF:**
**Violation of Civil Rights Act of 1871, 42 U.S.C. § 1983**

169.   Plaintiff incorporates and alleges the averments contained in paragraphs 1-140 by reference.

170.   "Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  Civil Rights Act of 1871, 42 U.S.C. § 1983.

171.   The practice of law is a matter of right for one who is qualified by his learning and his moral character.  *Baird v. State Bar of Ariz.*, 401 U.S. 1, 7 (1971).

172.   Whenever a State official or agent causes a United States citizen to be denied a right or a privilege for an irrational basis that individual's civil rights are violated.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 169-70 (1970).

173.   Defendants caused Plaintiff's right and privilege to practice law in Maryland to be denied by issuing an unfavorable recommendation for "lack of candor" and "failing to disclose."

174.   This recommendation, however, is irrational because it is a direct contradiction to the facts that was before the Board.

175.   The character committee's report was given to the Board in June 2, 2017.  In that same month, the Board issued a notice to Plaintiff calling for a hearing to discuss (1) the facts surrounding "your engaging in the unauthorized practice of law," (2) the facts surrounding "your failure to disclose that you committed the unauthorized practice of law and contributed to the disbarment of Dalton Phillips'; and (3) whether there is a cumulative pattern reflected in the matters identified above which suggests a pattern of a lack of candor and failure to abide by the law.

176.   At the hearing, Plaintiff's attorney, Paul Sandler, thoroughly prepared to addresses these issues, showing that (1) Plaintiff did not know that his actions amounted to the unauthorized practice of law and has since this incident, rehabilitated himself by enrolling in ethics courses, taking and passing the professional responsibility exam, and soliciting the services of a mentor, his attorney, Paul Sandler, on these issues; (2) showing that Plaintiff did in fact disclose the facts surrounding this incident in his 2016 Maryland Bar application, but in a separate sheet of paper attached to the back of his application, and (3) showing that there is no record of him ever having failed to abide by the law or disclose necessary information.

177.   In October 2017, Defendants published a recommendation stating that "there was no indication the Applicant had apprised the Character Committee of the February 22, 2017 Court of Appeals opinion."

178.   The Board further published that, "it appears that the events related to the applicant's unauthorized practice of law and his prominent role in his father's disbarment *may not* have been sufficiently explored." (emphasis added).

179.   These statements are false statements issued by the Board.

180.   In the Character Committee's report, delivered to the Board on June 2, 2017, Ms. Johnston writes that Plaintiff's involvement with his father's disbarment was discussed "at length."

181.   The Board was in possession of this report on June 2, requested a hearing on June 16, and held a hearing on July 15, and at *no time* did any member of the Board ask Plaintiff, Plaintiff's attorney, or the Character Committee member who interviewed Plaintiff, whether the events they claimed "appeared to have been sufficiently explored" were sufficiently explored.

182.   Because the clear facts show that Plaintiff did disclose information to the Character Committee, the Board's reason for the denial is irrational, baseless, and flat out untrue.

183.   The Board also accused Plaintiff of failing to disclose his involvement with this father's disbarment to the Board.

184.   This is equally false.

185.   Plaintiff cut and paste a cease-and-desist letter on a 2007 letter head, signed his father's name to the letter, then mailed the letter in May 2015 to a lady in Indiana he had never met.

186.   This initiated an investigation into his father by the Attorney Grievance Committee in June 2015.

187.   Plaintiff did not learn that he was a party to this suit against his father until January 2017.  As soon as he received the subpoena from Lydia Lawless, the attorney representing the Attorney Grievance Committee, he notified his then attorney, Norman Smith, who in turn, notified the Board.

188.   Since counsel represented Plaintiff in a matter before the Board, his duty to disclose was directed to his attorney.  In 2013, while being represented by his attorney Mark Foley, Plaintiff sent a letter directly to the Chair of the Character Committee inquiring about the delay on his application.  For this, he was admonished stating that he was not to communicate directly with the Board since he was represented by counsel.

189.   The clear fact is Plaintiff promptly disclosed his involvement with his father's disbarment to his attorney in January 2017, and then again in May 2017 to the Character Committee.

190.   Defendants' willfully and intentionally violated Plaintiff's Civil Rights because they knew that there were reasons to recommend he lacked candor and the moral character to practice law and they knew that he was fully rehabilitated even if it was deemed he was unfit in signing his father's name.  Plaintiff has suffered damages in excess of $2,000,000.00 due to Defendants' willful violation of his civil rights.

### THIRD CLAIM FOR RELIEF:
### Violation of Due Process Rights: Unfounded Basis for Adverse Recommendation

191.   Plaintiff incorporates and alleges the averments contained in paragraphs 1-190 by reference.

192.   When there is no basis for the finding that an applicant fails to meet the qualifications required to practice law, the applicant is denied due process of the law.   *Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 262 (1957).

193.   "A state cannot exclude a person from the practice of law for reasons that contravene the Due Process clause of the Fourteenth Amendment." *Schware v. Bd. of Bar Examiners*, 353 U.S. 232, 238-39 (1957).

194.   Officers of a state cannot exclude an applicant for admission to the bar when there is no basis for their finding that he fails to meet the standards of qualification. *Id*. at 239.

195.   When an applicant is denied admission to a State bar on insufficient evidence to raise substantial doubt as to his present good moral character that applicant is denied due process. *Id*. at 247.

196.   When, from the record, an applicant appears to be a man of religious conviction and has trained his children in the beliefs and practices of his faith; has good repute among his teachers, his fellow students, and associates in his church; and demonstrates candor by informing the Board of his personal history, and when not a *single witness testifies* that the applicant is not a man of good character, this applicant must not be denied admission into a State bar. *Id*. at 240-47.

197.   Like the applicant in *Schware*, Plaintiff proved to be a man of religious conviction and has trained his children in the beliefs and practices of his faith; has good repute among his law professors, his fellow employees, other attorneys, a magistrate judge, pastors and elders, and associates in his church; and

demonstrates candor by informing the Bar of his personal history, and *not a single witness testified that this is not a man of good character.* (emphasis added).

198. Nothing in the record, on its face, suggests that Plaintiff is unfit to practice law. The reason given by Defendants is a false justification because the record clearly shows that by supplementing the record during the four-year delay he has a history of candor.

199. Because Plaintiff's denial, like the--*applicant's in Schware*--is based on misinformation, his Due Process Rights have been violated.

200. Defendants' actions were willful and as such Plaintiff was damaged in the amount of $5,000,000.00.

### FOURTH CLAIM FOR RELIEF:
### Due Process Violation: Denied Opportunity To Be Heard

201. Plaintiff incorporates and alleges the averments contained in paragraphs 1-200 by reference.

202. A State must afford to all individuals a meaningful opportunity to be heard if it is to fulfill the promise of the Due Process Clause. *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971).

203. The Constitution requires an opportunity be granted at a meaningful time and in a meaningful manner for a hearing appropriate to the nature of the situation. *Id.* at 378.

204. In Plaintiff's situation, he was not afforded an opportunity to be heard on the issue concerning NASAA, his e-mail address, or the erroneous idea that he did not disclose his involvement with this father's disbarment.

205.    In December 2017, Defendants received a letter from Ms. Mirko from the General

        Counsel for the North American Securities Administrators Association

        (NASAA).

206.    Defendants then, without issuing a hearing for Plaintiff to address the NASAA

        letter, communicated this information directly to the Court.

207.    As a result, the Court, without issuing a hearing to Plaintiff, published an

        opinion that is based on information that Plaintiff never had an opportunity to

        explain or defend.

208.    As a result, the Court denied Plaintiff and published information that is flatly

        incorrect, even misquoting the affidavit from Ms. Mirko.

209.    In fact, Plaintiff was not offered an opportunity to be heard on *any* of the issues

        published in the Court's opinion or in the Board's unfavorable recommendation.

210.    The only issues to which Defendants provided notice and the opportunity to be

        heard are issues outlined in the Defendants' June 2017 Notice, but their final

        recommendation for denial and the following Court Opinion are based on none

        of these issues and on issues Plaintiff was never given the chance to address.

211.    This is an extreme Due Process violation and has ruined Plaintiff's character and

        reputation and ability to secure meaningful employment.

212.    Defendants' violation was extreme and willful and as such Plaintiff has suffered

        damages of $2,000,000.00 for this willful violation.

### FIFTH CLAIM FOR RELIEF:
### Due Process Violation: Unconstitutional Delay

213.    Plaintiff incorporates and alleges the averments contained in paragraphs 1-212

        by reference.

214.    Any State act "permit[ting] a delay without limit is unconstitutional." *Riley v. Nat'l Fed. of the Blind*, 487 U.S. 781, 783 (1988).

215.    Defendants took longer to review Plaintiff's application for admission into the State Bar than it took for Plaintiff to graduate law school.

216.    Nothing more needs to be said on this.  In fact, it would be more compelling (and amusing) to read Defendants' justification for holding Plaintiff's application open for over *3.5 years* without explanation than it would be for Plaintiff to argue against it. (emphasis added)

217.    As it stands today, the admissions process allows Defendants to delay any applicant in perpetuity.  To place a life on hold, without cause or reason, is in itself immoral.

218.    The Board writes that the application was held open for applicant to supplement the record.

219.    This again is not true.  In February 2012, applicant was asked to supplement his application with a current copy of his credit report.  He did this within 30-days of the request.  The application was held open for another 3.5 years.

220.    The unexplained 3.5-year delay is unconstitutional and damaged Plaintiff, and the Court must declare as such.

221.    Defendants' delay was willful and with malice and as such Plaintiff suffered damages in the amount of $2,000,000.00.

**SIXTH CLAIM FOR RELIEF**
**Gross Negligence: Failure To Consider and Disclose Full Record**

222.    Plaintiff incorporates and alleges the averments contained in paragraphs 1-221 by reference.

223. Gross negligence has been defined as "a failure to perform a manifest duty in reckless disregard of the consequences as affecting the life of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. *Cooper v. Rodriguez*, 443 Md. 680, 686, 118 A.3d 829, 833 (2015).

224. Any tortious act or omission of State personnel that is made with malice or gross negligence is an exception to common law public official immunity. *Id.*

225. A State employee is guilty of gross negligence when he or she inflicts injury intentionally or is so utterly indifferent to the rights of others that he or she acts as if such rights did not exist. *Barbe v. Pope*, 402 Md. 157, 187, 935 A.2d 699, 717 (2007).

226. The character process places the duty of disclosure on both the applicant and the Board. First, the applicant has a duty disclose all activities that give rise to character, whether those activities suggest moral or immoral character. This disclosure to the Board is necessary for the Board to make a determination of the applicant's character. Second, the Board has a duty to disclose all of the activities it received from the applicant regarding character to the Court of Appeals. This disclosure is necessary for the Court, the body who makes the ultimate decision on the applicant's character, to make it's own independent decision on the applicant's character.

227. The Board breached its duty in both areas. First, it failed, either intentionally or recklessly, to consider the enormous mountain of Plaintiff's good character evidence in making a character determination. Second, it failed again to disclose

the same mountain of evidence to the Court so the Court could make it's own

character determination.

228.    In making a determination of an applicant's character, Maryland law requires

Defendants to weigh *all* evidence and testimony bearing on the applicant's

character.

229.    "When the record is wholly barren on one word, sentence, or paragraph that

tends to show [the applicant] is not morally and professionally fit to serve

honorably and well as a member of the legal profession, it is error not to admit

the applicant to the Bar." *Baird*, 401 U.S. at 8.

230.    The record is ripe with testimony from witnesses showing the Plaintiff-Applicant

to be of good moral character and contains no testimony that he is not of good

moral character.

231.    Plaintiff supplied Defendants with a plethora of "good character" evidence, but

this did not include the evidence Defendants could have and should have

secured on their own.  The Internet is ripe with Plaintiff's writings that are

indicative of sound, good moral character.

232.    The fact that the Board fails to mention any of the character witnesses'

testimonies can mean only one of two things: (1) they did not believe any of the

witnesses, or (2) they ignored or neglected the witnesses.

233.    Because Maryland creates a presumption that clergymen and judges are

inherently honest unless proven otherwise, and because the attorneys testifying

that Plaintiff possesses sound moral character worthy of admission to the Bar

would jeopardize their own right to practice law if their testimony were not

truthful, it can be concluded that the Board did not believe the witnesses' testimonies to be untruthful.

234. This leaves only one logical conclusion as to why the Board did not mention any of the testimony presented by all of the witnesses on record — gross negligence.

235. The Board was intentional, reckless, or intentionally reckless in failing to consider and mention any of the character evidence submitted on behalf of the Plaintiff in recommending Plaintiff be denied admission into the Bar.

236. This failure is extreme and grossly negligent.

237. Plaintiff has suffered damages in the amount of $5,000,000.00 for Defendants' willful and gross negligence.

## SEVENTH CLAIM FOR RELIEF:
### Defamation

238. Plaintiff incorporates and alleges the averments contained in paragraphs 1-227 by reference.

239. To establish a prima facie case of the common law tort of defamation in Maryland, a plaintiff must establish four elements: (1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff suffered harm. *Hosmane v. Seley-Radtke*, 227 Md. App. 11, 20-21 (2016) citing *Offen v. Brenner*, 402 Md. 191, 198, 935 A.2d 719, 723-24 (2007).

240. A defamatory statement is one "which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person." *Batson v. Shiflett*, 325 Md. 684, 722-23, 602 A.2d 1191, 1210 (1992).

241. Defendants defamed Plaintiff by publishing to the Court of Appeals that Plaintiff did not disclose his involvement with his father's disbarment to the character committee when the fact is he *did* disclose his involvement to his father's disbarment to the character committee.

242. Defendants knew or had sufficient reason to know that this statement was false.

243. Plaintiff has suffered the loss of friendship, loss of employment, loss of employment opportunities, the loss of loans, and the loss of respect.

244. Plaintiff nearly suffered the loss of his life.

245. Defendants further defamed Plaintiff when it published that Plaintiff lacks candor and is dishonest and lacks the requisite moral character for it's bar admission.

246. The record shows and there is nothing to the contrary, that Plaintiff is of high moral standard and that he possesses the requisite moral character for admission to the Maryland bar.

247. These defamatory remarks were committed with malice and a high disregard for Plaintiff's rights and overall well-being.

248. Plaintiff has suffered immensely from Defendants' defamatory and callous remarks.

249. Plaintiff seeks $5,000,000.00 in damages for Defendant's willful and gross disregard and defamatory remarks committed with malice.

**Evidence**

250. All of the proof and evidence in this Complaint is as follows:

    (a) The 2008 Character committee member's, Gary Bair, favorable character recommendation for Plaintiff's admission into the Maryland Bar (Ex. 1);

(b) The 2017 Character committee member's, Deborah Johnston, character recommendation for Plaintiff's admission into the Maryland Bar (Ex. 2);

(c) Antoinette McCree's character reference letter describing Plaintiff as having "the highest level of integrity" and being an "honest and just person." (Ex. 3);

(d) Jennifer McClune's character reference letter recommending admission based on high moral character. (Ex. 4)

(e) Lloyd Scott's character reference letter recommending admission based high moral character. (Ex. 5)

(f) Maria Martinez's character reference letter recommending admission based on high moral character. (Ex. 6)

(g) William Wayland's character reference letter noting Plaintiff's community work and describing him as having "stellar" moral character. (Ex. 7)

(h) Adrian Matthew's character reference letter recommending admission based on high moral character. (Ex. 8)

(i) John Evans' character reference letter recommending admission based on high moral character. (Ex. 9)

(j) Tanya Corbin certifying Plaintiff as having good moral character. (Ex. 10)

(k) Pascale Ghafari's character reference letter detailing incidences of high moral character as a parent and a community worker. (Ex. 11)

(l) Nicole Allen's character reference letter describing Plaintiff as "morally upright in character" and recommending his admission. (Ex. 12)

(m) Paul Sandler Memo to the Board outlining issues to be discussed at hearing. (Ex. 13)

(n) Pastor Melvyn Hayden describing Plaintiff as a man "of great integrity, honesty, and is extremely dedicated to his family and community." (Ex. 14)

(o) Pastor Damien Johnson's character outlining all of Plaintiff's community services and finding him as a man of "high level of integrity, commitment, and honesty."  Also noting his 2015 Mend of Honor, Helping Hands Award. (Ex. 15)

(p) Elder Gabriel Baptiste, describing Plaintiff as having "exceptional moral conduct" and describing his deeds as a parent and church member. (Ex. 16)

(q) Kellie Howard describing, in detail, how Plaintiff has "voluntarily" helped her and her children, describing his morality and honesty. (Ex. 17)

(r) Professor David Chavkin providing a detailed description of Plaintiff's character and recommending him for admission. (Ex. 18)

(s) Attorney Theodore Frank, describing Plaintiff has "trustworthy and honest." (Ex. 19).

(t) Forensic Report for Solon Phillips (Ex. 20)

**WHEREFORE,** Plaintiff requests this Court to award him the total sum of $26,000,000.00 for the damages caused by Defendants.

DATE: March 3, 2020

Solon Phillips, Pro se
4801 Bartletts Vision Drive
Bowie, MD 20720
202-329-1799
solonesq@gmail.com